**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------------x

LUISA SANTANA on her own behalf

                        Plaintiff,

   -against-                                              **COMPLAINT**

MARSH & MCLENNAN COMPANIES, INC.,                        **17-cv-5755**
MARSH, INC. and PAUL EVANS, Individually,
jointly and/or severally                                 **JURY TRIAL**
                                                         **DEMANDED**

                        Defendants.
-------------------------------------------------------------------------------x

Plaintiff LUISA SANTANA ("Plaintiff") by and through the undersigned counsel Mirer

Mazzocchi Schalet Julien & Chickedantz PLLC, and for her Complaint against Defendant MARSH

& MCLENNAN COMPANIES INC., MARSH, INC. (hereafter  collectively "Marsh" as the

"company" or "Corporate Defendants"), and PAUL EVANS (hereafter "Evans"), (collectively

"Defendants") allege as follows:

### NATURE OF THE ACTION

1.       After thirty-two years in the insurance industry, Plaintiff Luisa Santana had her

career destroyed by the actions of Defendant Paul Evans, her UK-born white male supervisor, who

over the course of three years subjected Plaintiff, a Vice President Marsh & McLennan Companies

Inc., to a severe and pervasive atmosphere of gender and race based hostility.

2.       This atmosphere was so severe and pervasive that approximately one and a half

after Plaintiff brought Evan's hostile actions to the attention of the company to no avail the

situation became so egregious that multiple employees reported the actions to the company once

more.

3.       Shockingly, the company's response was again to deny the actions.  Plaintiff was

most betrayed however by the actions of the company to excuse and minimize Defendant Evans'

behavior to the point of retaliating against her by HR issuing a veiled threat of bodily harm.

1

4.     Marsh & McLennan Companies, Inc. is the nation largest insurer.

5.     Yet, despite its knowledge of the laws and liability created when companies do not prevent discrimination and harassment, Marsh welcomed discrimination when it hired Defendant Paul Evans to head up an elite practice group in its New York office.

6.     Defendant Evans and his male reports openly and regularly and repeatedly referred to Plaintiff as a "wetback", and a "Mexican", opined on her bra size calling her a "double D", falsely accused her of having sexual relations with colleagues, remarked "you are only here because of affirmative action," referred to her as "brown people," stated "you all look alike" and "you're all the same" and mocked and denigrated her promotion of diversity initiatives and activities within the company.

7.     Within weeks of her hire Plaintiff realized that Defendant Evans had remade the culture of the office from one of professional sobriety to a severe and pervasive atmosphere of sexual and racial harassment against Plaintiff, a thirty-two year veteran of the employment industry.

8.     Evans did this openly without warning or reprimand from Marsh despite the brazen, open and notorious nature of his harassment.

9.     Further, when Plaintiff complained of that she was greatly distressed by the use of racial epithets such as "wetback" against her and the lewd and sexually suggestive comments directed at her by the all-male members of her practice group with the full participation and encouragement of Evans, the company did not take appropriate action but sought to minimize Evans' actions, suggesting she needed to "learn to get along."

10.     Defendant Evans' harassment of Plaintiff was so open and notorious, that Plaintiff, after receiving no relief from Corporate Compliance and reasonably deeming such complaints futile, was required to endure such egregious harassment that it took three other employees bringing these egregious acts to the attention to the Corporate Compliance for them to act.

11.     Defendant Marsh allowed Evans to remake Plaintiff's job into a sexually and

racially hostile work environment, taking no remedial action to address this discrimination and harassment.

12.     Later the company went so far as to make excuses for the unlawful behavior, promising Plaintiff "we can change him."

13.     Defendants' conduct is in violation of 42 U.S.C. §1981 and 42 U.S.C. §2000(e).

14.     Plaintiff filed a timely complaint of national origin and sex discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). A notice of right to sue was mailed from the EEOC on April 28, 2017 and received on May 1, 2017.

15.     Plaintiff also brings this action on her own behalf for violations of the New York State Human Rights Law ("NYSHRL"), the New York City Human Rights Law ("NYCHRL"), seeking declaratory injunctive and equitable relief, as well as monetary damages to redress Defendants' unlawful actions.

## JURISDICTION

16.     Plaintiffs' claims arise in part under 42 U.S.C. §1981 and 42 U.S.C. §2000(e). This Court has jurisdiction over plaintiffs' federal claims pursuant to 28 U.S.C. §§1331 and 1337, and has supplemental jurisdiction over plaintiff's State and City claims pursuant to 28 U.S.C. §1367.

17.     Venue is proper in the Southern District of New York under 29 U.S.C. §1391, as the majority of events giving rise to these claims occurred within this District.

18.     Venue is proper in the Southern District of New York pursuant to 28 USC §§1391(b) and (c) because and a substantial part of the events or omissions giving rise to this action occurred in this district; Defendant Marsh has corporate offices that can be found in this district; Defendants conduct business in this district and are subject to personal jurisdiction in this district.

## PROCEDURAL REQUIREMENTS

3

19.     Following the commencement of this action, a copy of this Complaint will be served on the New York City Commission on Human Rights, thereby satisfying the notice requirement of § 8-502 of the New York City Administrative Code.

20.     Plaintiff filed a timely charge of national origin, sex discrimination, and retaliation under Title VII of the Civil Rights Act, 42 USC §2000e *et. seq.,* with the Equal Employment Opportunity Commission and on May 1, 2017. This case was timely filed within ninety (90) days' of Plaintiff's receipt of the Right to Sue Letter. (Attached as Exhibit A)

21.     Any and all other prerequisites to the filing of this suit have been met.

## PARTIES

22.     Plaintiff Luisa Santana ("Plaintiff" or "Ms. Santana") is an adult female resident of New Jersey.

23.     Plaintiff is a Hispanic woman who was born in the Dominican Republic.

24.     Plaintiff had been employed by Defendant Marsh as a Vice President in the US Entertainment & Events Practice Group (the "Practice Group") from October 16, 2013 and still remains an employee of March but on unpaid leave status.

25.     Plaintiff was the only female in the New York office of the Entertainment and Events Practice Group and the only person of color in the group.

26.     Previously Plaintiff had been employed by Marsh from 2003 to 2006

27.     In total Plaintiff has over thirty-two (32) years in the insurance industry as a leading professional.

28.     Plaintiff had an excellent performance record and consistently earned the highest ratings in her Practice Group.

29.     From October 22, 2015 to September 2016 Plaintiff was on a paid disability leave required by injuries suffered from the hostile work environment described herein.  She has been on unpaid leave since then.

30.     Defendant Marsh & McLennan Companies, Inc. ("MMC") is a Delaware corporation with its principal place of business at 1166 Avenue of the America, New York, New York. The Company is the parent Company of subsidiaries and affiliates that provide clients with risk and insurance services, investment management and consulting.

31.     MMC is the largest insurance broker in the United States and one of the largest in the world.

32.     Defendant Marsh Inc. (together with MMC, "Marsh") is a Delaware corporation and a wholly owned subsidiary of MMC with its principal place of business at 1166 Avenue of the America, New York, New York.

33.     Defendant Paul Evans (hereafter "Defendant Evans") is an adult male resident of New York, New York.

34.     Defendant Evans is a Caucasian male of English national origin.

35.     At all times relevant Defendant Evans was in the position of East Zone Entertainment Lead or U.S. Entertainment and Events Practice Leader.

36.     At all times relevant Evans was Plaintiff's supervisor and she reported to him directly, or indirectly.

37.     Defendant Evans is a current employee of Marsh and was Plaintiff's direct supervisor in her Practice Group upon her return to the Company in October 2013.

38.     Defendant Evans issued Plaintiff's performance reviews, supervised Plaintiff's work, was empowered to discipline Plaintiff, to set Plaintiff's salary and bonus compensation, and did in fact hire Plaintiff.

### RETURN TO MARSH: THE ENTERTAINMENT AND EVENTS PRACTICE GROUP

39.     Ms. Santana has worked in the field of insurance for thirty-two years since 1985. Plaintiff was headhunted while at her previous position for Aon in 2003 to work at Marsh to handle the Rockefeller Risk Advisory group.

40.     When the Advisory group was disbanded in 2006 Ms. Santana left New York to be with her family in Florida.

41.     Seven years later, in October 2013 she was invited to join a newly reconfigured Entertainment Department. This is an elite group within Marsh catering to VIP clients. The call had come on the recommendation of persons at Sony, a VIP client of the entertainment group, who were familiar with Ms. Santana's work and recommended her as the best person to handle entertainment/media accounts.

42.     Ms. Santana had long been a high earner and star producer for the company and she looked forward to joining the group.

43.     She loved her work and looked forward to meeting with her clients.

44.     Ms. Santana came back as Executive VP of Sports and Entertainment, handling major accounts including the Economist, Netflix, and Viacomm.

45.     Her new supervisor, a man who was not involved in her hire, was Defendant Paul Evans, a British born white male.

46.     The other members of the group were her junior college Robert Stockley, and another VP Scott Schachter. At some Martin Ridgers transferred from the Los Angeles Office to the New York Office and joined the team at Senior Vice president.

47.     Initially all the members of the team reported to Robert Murphy.

48.     Plaintiff had no misgivings about being the only woman in the group, nor the only minority. She was proud of her heritage. She was an active committee/board member of the Employee Relations Groups for the Hispanic, Asian, Pride and Women's Exchange groups at Marsh.

49.     Initially, she was excited to return after several years in Florida. She is a self-described insurance "geek".

50.     Within weeks of her return however Plaintiff realized that the office culture had entirely changed.

51.     Ms. Santana had been hired by David Bidmead and Robert Murphy.

52.      Initially she and Evans had reported directly to Murphy, but later she was assigned to directly report to Evans who was promoted from the position of East Zone Entertainment Lead or U.S. Entertainment and Events Practice Leader.

53.     This change in reporting affected Plaintiff significantly and in negative ways.

54.     Under the leadership of Evans, she was shocked and offended to find within her group, a culture she had never previously associated with Marsh. It appeared that Mr. Evans encouraged a culture where lewd talk, sexual innuendo, and demeaning and denigrating comments about women and minorities were the norm. These conversations included Ms. Santana and she was humiliated and offended by these comments.

55.     Not only did these comments denigrate Plaintiff as a woman, and sexually objectify her, other comments were directed to Plaintiff's race and specifically denigrated her as a Hispanic, foreign born woman.

## EVANS BEGINS HIS CAMPAIGN OF RACE AND GENDER DISCRIMINATION AND SEXUAL HARASSMENT: THE PHILADELPHIA TRIP

56.     Ms. Santana learned the extent of the hostility within two weeks of her hire when on October 29, 2013 she travelled with the group to Philadelphia for a team meeting with the Philadelphia office. Ms. Santana was the only woman at the meeting. That morning as she was getting off the elevator, Defendant Evans, in front of the assembled group asked, "How was it sleeping with Martin in your room last night."

57.     Ms. Santana was very embarrassed. Her ears got extremely hot.  She tried to ignore it and smiled and walked away.

58.     Ms. Santana had no sexual or romantic involvement with her colleague Martin Ridgers—she did not welcome such involvement, she had a partner of ten years—and she was a sickened disgusted and humiliated by this unlawful remark.

59.     Plaintiff felt professionally smeared and undermined by Defendant Evans insinuation that she was "sleeping her way to the top." It was clear to her that she was being targeted as a woman and/or a Hispanic woman based on stereotypes of the sexual availability of black and Hispanic women.

60.     Plaintiff had never before experienced an act of discrimination like this and its effect was searing. She was shocked.

61.     After the events in Philadelphia, Plaintiff was very concerned to maintain her professional dignity, authority and status but this was becoming increasingly difficult.

62.     Defendant Evans had begun regularly referring to her as a "Mexican."

63.     From this time on in late 2013 though the entirety of her tenure at Marsh, on a daily basis Defendant Evans referred to Plaintiff as "the Mexican" or "wet back," both alone and in the company of other practice group colleagues.  Plaintiff told him numerous times that her national origin is from the Dominican Republic and not Mexican but he persisted in calling her "the Mexican."

64.     Defendant Evans' only response to Plaintiff was "you all look alike" and "you're all the same." Plaintiff was humiliated and demeaned by these terms and would often feel like crying, and break down in tears outside the building and in the restroom.  When she heard these comments Plaintiff was greatly distressed. She spent a lot of time in the restroom trying to compose herself. The worst part was that Defendant Evans regularly made these racist epithets to Plaintiff in front of colleagues outside of their Practice, and knowing that others including clients has witnessed her

8

humiliation compounding her shame.  For example, on January 31, 2014 when Plaintiff and Defendant Evans were at a Mexican restaurant and Evans remarked, via text message, "I think he [Martin Ridgers] wants to wrap you in his own tortilla …smother re-fried beans all over… Just the three of us then, Mmmmmm, cozy."

## RACIAL AND OR GENDER HOSTILITY FROM OTHER MALE TEAM MEMBERS ON THE HEELS OF THE PHILADELPHIA INCIDENT

65.     With Defendant Evans' epithets and undermining comments, Plaintiff felt her position and authority being eroded in many ways.

66.     Shortly after the Philadelphia trip, following Defendant Evans' lead, her own assistant, Robert Stockley, routinely began ignoring Ms. Santana's directives. In fact, Stockley had an extreme reaction to Ms. Santana.  He refused to speak to her, look at her, or respond to her questions. Ms. Santana was told that Stockley's role as insurance specialist – a non-officer title-- was to assist her but he absolutely refused and. Evans supported him in this.

67.     Specifically, assistants to VPs were required to generate insurance certificates on an emergency basis but quite frequently Stockley refused when Plaintiff made such requests. Stockley's refusals were of such a nature that Plaintiff had to resort to ordering a Certificates of Insurance (COI) program and taught herself how to do them after Stockley refused to demonstrate how to use the system

68.     When Ms. Santana mentioned this problem with Stockley to Defendant during her first performance review in December 2013, Defendant Evans took no action to reprimand Stockley and dismissed her concerns.

69.     Further, while Plaintiff was traveling for work as she often did, Stockley never supported Plaintiff.

70.     At the same time, Schachter became generally hostile towards Plaintiff. At one point in the fall of 2013, Schachter and Stockley remarked to Ms. Santana,  "I don't know why they hired

you. They should have just taken your salary and split it between me and Rob."

71.      Throughout this time Defendant Evans continued to denigrate Plaintiff as a woman, on account of her race, and to sexually harass her.

72.      Around Christmas 2013 Plaintiff and Defendant Evans were involved with the Victoria's Secret account, and Defendant Evans remarked that Plaintiff must be a "double D." Again Plaintiff was disgusted and felt utterly demeaned by this unwelcome comment.

## DISPARATE TERMS AND CONDITIONS OF EMPLOYMENT, AND EFFECTIVE DEMOTION BECAUSE OF GENDER AND RACE

73.      Under Paul Evans, Plaintiff was effectively demoted and subjected to disparate terms and conditions of employment because of her gender and/or race.

74.      Consistent with the rebellion of her white male assistant Stockley, who refused to take her direction, soon she was required to perform administrative tasks to support the group.

75.      Soon Plaintiff was required to prepare COIs for Defendant Evans and perform tasks that were assigned to Stockley, the latter whom was permitted to delegate such to Plaintiff even though she was a VP.

76.      Effectively not only had Plaintiff been demoted but also Stockley was effectively promoted.

77.      Plaintiff's effective demotion was most painfully felt when the practice group moved offices to the 41st floor from the 37th floor in February 2014. After the move in Plaintiff was assigned a workstation that is normally assigned to a member of support staff, while her white male assistant Stockley was assigned a window seat usually assigned to Officers of the Company. This caused day to day humiliation as clients would walk by and ask Plaintiff for directions, typing favors, booking conference rooms, and other Administrative duty requests.

78.      Routinely Plaintiff was asked to perform clerical duties while Schachter was not. For example, Defendant Evans assigned her the job of securing conference rooms for meetings, making

corrections on sell sheets, getting him tickets to things and other administrative type duties.

79.     Although Plaintiff was hired as a VP, she was increasingly being viewed by Defendant Evans as the team's secretary. Being assigned the administrative assistant work station, Plaintiff often found herself escorting clients/underwriters who were lost on the floor to the right party.

80.     Consistent with this demotion, Plaintiff was also denied privileges of employment consistent with her position and title.

81.     Specifically, on or about April 27-30 2014, Defendant Evans invited Schachter to RIMS/Colorado to the exclusion of Plaintiff, though she and Schachter have the same title.

82.     This favoring of Schachter, and even her subordinate Stockley, became a pattern.

83.     In May 2014 the practice group was slated to attend an industry conference called NACA. Defendant Evans invited Schachter and administrative assistant to attend at company expense for his accommodations but required Plaintiff to provide for her own accommodations.

84.     In this period Plaintiff was routinely excluded from professional outings such as golf and bar events, even as most of the client work was done at the bar or at the golf outings. Defendant Evans refused to invite Plaintiff, while frequently inviting Schachter and even Stockley, a non-executive.

85.     Further, Defendant Evans began to cut off Plaintiff's expense account that was essential to attend meetings and entertain potential clients. Plaintiff was required to justify her expenses while Defendant Evans and Schachter traveled and used their expense accounts freely. Plaintiff received so much hostility from Defendant Evans regarding the use of her expense account that she stopped submitting expense reimbursements for Defendant Evans' approval in April of 2015 and self -funded her professional activities in an effort to avoid conflict, to the tune of several thousand dollars.

86.     In May 2015 Defendant Evans required Plaintiff to provide for her own

accommodations to attend NACA or attend "only if you could find someone to stay with," even as Marsh had a strict no room share policy. Accordingly Plaintiff missed this important professional event two years in a row due to Defendant Evans actions.

87.     Moreover Plaintiff was repeatedly denied client leads by Defendant Evans. Despite Defendant efforts to stymie Plaintiff's professional success, Plaintiff continued to provide her clients good results and was able to secure many new accounts. Even when she had successes, however, Defendant Evans sabotaged her success by placing his name on her account alongside hers, as he did with the Burger King account Plaintiff secured for the company, even as the client was not interested in representation by Evans.

88.     Similarly Defendant Evans sought to exploit Plaintiff's personal contacts for his own gain. For example, with TD Ameritrade, Diageo, Sonofi-Advantis and American Express, he insisted on giving either himself or Schachter credit for Plaintiff's work.

89.     Defendant Evans and Schachter greatly benefitted by placing themselves on Plaintiff's accounts, to Plaintiff's detriment.

90.     This pattern of effective demotion, placing obstacles to Plaintiff's advancement and hijacking financial rewards properly due to Plaintiff continued for the entirety of Plaintiff's tenure at the Company.

91.     At no time did Defendant Evans take any such acts against male members of the practice group, and moreover he allowed Schachter and others males to benefit from the privileges and rewards denied to Plaintiff.

## MARCH 14, 2014 COMPLAINT TO H.R.

92.     On March 14, 2014 fed up of the harassment and exclusion, Plaintiff spoke to Human Resources representative, Dorian Frederick about Defendant Evans' continuous use of epithets such as Mexican, his sexual harassment and the exclusion she suffered from the boys club. Frederick denied that Evans was "doing anything illegal." And with respect to the term "Mexican",

suggested that Plaintiff tell Evans, her boss, that she would like him to stop.

93.    The company did not take any further steps and failed to launch an investigation or monitor the situation at this time.

94.    Plaintiff was appalled that the company took no corrective action, made excuses for Evans' behavior and placed the burden of stopping the racial harassment by Evans, her boss, on Plaintiff herself. Realizing that it was futile to go to HR, Plaintiff focused on her work and tried to put up with the intolerable situation.

95.    Throughout 2014 the harassment continued.

## DECEMBER 2014 HOLIDAY PARTY

96.    In December 2014 Plaintiff attended a team holiday dinner at a restaurant called 45 Bond.

97.    Plaintiff arrived at the party directly from a business event for New York Women Insurance in Television. As she walked in, Defendant Evans pointed at her breasts in front of the entire team and said, "Oh my God, look at those…"

98.    Plaintiff was humiliated.

99.    After the dinner Martin Ridgers said "I am so sorry love" and "that's just Paul's humor, Paul was just joking." Then, a Los Angeles team member who was in town, Francisco Cabrera, tried to apologize for the guys after realizing how inappropriate and offensive Evans' remarks were.

100.    Plaintiff was later told by Ridgers that, unbeknownst to her, her breasts were a frequent topic of conversation among her male colleagues.

## SEXUAL HARASSMENT AND GENDER AND/OR RACE BASED DISCRIMINATION AND HOSTILE WORK ENVIRONMENT CONTINUES IN 2015

101.   On January 27, 2015, Evans wrote via email to the entire group including Plaintiff and while discussing working from home due to transit issues asked if the group members were working in their underpants.  In response to Evan's statement: "are you sat in just your underpants." Martin Ridgers responded to the entire group: "No I take them off so they do not ride up on me and I feel free."  This was accompanied by a shockingly offensive photograph of a naked man. Plaintiff has shocked to receive this suggestive material at work.

102.   On April 21, 2015, Defendant Evans sent Plaintiff an email that suggested that she was having sexual relations with Martin Ridgers. It stated, "I can only assume you lost yourself in Martin's breathing pattern …. Yuck!!"  The email was sent to the entire group. Again Plaintiff felt demeaned and professionally undermined.

103.   Around this time in the Spring of 2015 Plaintiff closed a 25 million dollar deal for a client in London. Instead of commending Plaintiff on her work, Defendant Evans remarked that the London underwriter had assisted her in the deal  "because you are brown and he likes brown people, they're very good and …. You know…." Defendant Evans then proceeded to mimic fellatio with his hand and mouth. His too occurred in the presence of Ridgers, Schachter and Stockley.

104.   Plaintiff was devastated that her work continued to go unrecognized, that her professionalism was undermined, and that she was being demeaned as a Hispanic woman and sexually harassed by these entirely unwanted, false and unwelcome comments.

105.   Defendant Evans' harassment of Plaintiff led to her male colleagues having absolute license in their interactions to treat Plaintiff in a degrading manner due to her race and gender.

106.   For example on June 15, 2015, after a head of the NAACP in Oregon stepped down due to controversy over her racial identity, Schachter and Stockley were discussing this news and Schachter remarked in earshot of Plaintiff, referring to Plaintiff, who had her back to him,  "If it wasn't for affirmative action, you wouldn't be here."

107.   On June 18, 2015 Plaintiff innocently inquired with Schachter where he and

Defendant Evans had been that morning after not seeing them in the office.   The response was terrifically violent, Schachter approaching her and screaming in her face with such force that his saliva hit her glasses.   Schachter continued to scream at and berate her in front of the entire 41st floor. Plaintiff was terrified and attempted to move away but the tirade continued.

108.   Plaintiff was so shaken by this experience that she broke down in tears in the bathroom.

109.   Schachter had a history of screaming at and denigrating female clients, underwriters and brokers. Plaintiff had often heard him slam down the phone and remark that the woman he'd spoken with was a "fucking useless cunt."

110.   The racial and gender-based hostility continued, and on September 17, 2015, on Plaintiff's birthday, while she was out of the office on jury duty, she received an email from Defendant Evans cc'ing the entire team purporting to wish her a happy birthday. The email included a photo of an obese Latina woman with a large double chin and the following words "It's Luisa's birthday today and she's taken a day off to spend some quality time with loved ones.  I thought it would be nice to Google her name and post the first image that came up, as a way of celebrating her spontaneity and great attitude to all things.  Unfortunately, all I got was this ……"

111.   When Plaintiff read the email and saw the large number of people who were cc'd, she was extremely embarrassed and felt terribly ashamed.  She could not stop crying due to the intense feeling of humiliation.

112.   Throughout this period, in addition to his use of epithets Defendant Evans made false and unfounded accusations against Plaintiff such as her missing meetings.  Once, when out at a medical appointment, Plaintiff was reprimanded by Defendant Evans for missing an important meeting on the Netflix account.  With a few phone calls, Plaintiff established that no such meeting had occurred or been planned.  Defendant Evans instead had made the false accusations merely to intimidate and belittle Plaintiff.

113.    Such "head games," acts of hostility, and aggression happened on a weekly basis.

114.    Plaintiff was having difficulty coping and was depressed by the situation.

### REPORTING TO COMPLIANCE BY THREE COWORKERS

115.    As Plaintiff continued to endure the daily harassment from Evans and the males within her practice group she confided to an executive colleague about the harassment and abuse she had suffered at the company and HR's indifference. That executive had witnessed some of these acts first hand and found Plaintiff tearfully standing outside the office at 1166 Avenue of the Americas one afternoon and inquired what was wrong.

116.    After their conversation the executive told Plaintiff that he thought what she'd suffered was inexcusable and that it was completely improper that she was seated in an administrative section of the office. Discussing this issue with Plaintiff, the executive said he was going to Compliance.

117.    On October 13, 2015, at approximately 2 pm, Plaintiff was contacted by Ms. Roberts from Compliance and told that they had received complaints from three unnamed individuals regarding acts against Plaintiff that they had witnessed.

118.    Ms. Roberts asked Plaintiff to tell her story and stated that she needed to call HR. Moments later they were joined by Suzanne Bukhardt, Head of Employee Relations.

119.    At 4pm on October 13, 2015 Plaintiff met with Christopher Lang, a Managing Director and Defendant Evans' boss, as well as Bukhardt, and Ms. Roberts and discussed the sexual harassment and discrimination she had suffered.

120.    All in attendance expressed regret and sympathy for the treatment she had endured at Evans' hands.

121.    The next day Plaintiff sent all three persons in the meeting an email asking them not to disclose the contents of the meeting to the team until an event slated for October 15, 2016 was over.

122.     Plaintiff had been working tirelessly on organizing a large internal Marsh Diversity event to which her entire team, including Defendant Evans was invited, as well as several of Marsh's top clients.

123.     On the day of Plaintiff's event, Plaintiff was subjected to retaliation by Defendant Evans. Though she had requested that no one be informed of her complaint, it appeared that Evans had been informed. Evans asked to speak to Plaintiff privately in a conference room and issued a formal verbal warning due to Plaintiff's alleged poor "attitude" and because she had been acting "distant." This was Plaintiff's first such warning of any kind in the entirety of her tenure with the company. She had always had very high performance rating and was very afraid that the retaliation she feared from coming forward had begun.

124.     Then, at about 2:10 p.m. that day, Plaintiff received a call from Carmen Warren, Marsh's Senior Vice President/HR Business Partner, who explained that she was calling because the harassment had been reported anonymously by three different people to Human Resources. Unbelievably, she then stated, "You know the end result might be that sometimes you just need to learn how to get along."

125.     Plaintiff was devastated. After providing emails and many details about serious sexual harassment, Marsh was essentially blaming her and subjecting her to retaliation.

126.     At the event October 15, 2015 event Plaintiff was approached by Ms. Burkhardt while in the event coat closet on the 35th floor of the offices. Burkhardt told her, referring to Evans' harassment "It's not that bad, we can fix him."

127.     Plaintiff was appalled at this statement and the company's attempt to minimize and make excuses for Evans.

128.     Shortly thereafter at the event Plaintiff was approached by a woman identifying herself as from the compliance department, saying "Oh, you're Luisa!" This woman advised Plaintiff that another woman who had had a problem at the company filed a complaint and had a

heart attack as a result. She said, "be careful, a woman your age had a complaint filed with compliance and they did not handle it the right way. The woman's boss got into a shouting match with her and on her way home she died of a massive heart attack and all Marsh did was send her husband three white roses."

129.    Plaintiff understood that this comment was a veiled threat that should she pursue any action against the company that she, not the company, would be harmed.

130.    Plaintiff was shaken and terrified by this threat of bodily harm should be speak out about the harassment.

131.    These threats and excuses for Defendant Evans occurred at a company diversity event planned by Plaintiff.

132.    Outrageously the following day, Friday October 16, was disturbed by the company's response to her complaint as articulated to her at the October 15 event. She emailed Burkhardt asking what was her definition of "not so bad."

133.    While Plaintiff had not been outspoken, and suffered in silence, the harassment she endured was particularly humiliating due to its very public nature, being called slurs repeatedly in the midst of her colleagues, and Plaintiff did not believe that this actions were "not that bad."

134.    In response to her email to Burkhardt, on October 20, 2016 Plaintiff received an angry voicemail from Burkhardt asking her "who does she think she is?" This message was very threatening, and all of Plaintiff's fears about coming forward being the end of her career surfaced.

135.    That night and the next day, the stress and pressure caused Plaintiff's blood pressure to elevate greatly and at about 2:30 am to the point a panic attack. Plaintiff went to the emergency room for severe chest pains and collapsed in the lobby of the hospital. The doctors at the hospital told her that her blood pressure was dangerously high. She had no previous history of high blood pressure. Later that day, Plaintiff went to her physician who strongly recommended therapy as soon as possible and he prescribed an antidepressant.

18

136.   Plaintiff was debilitated by the hostility and discrimination and was deemed disabled.

137.   Plaintiff has since taken disability leave and continues to suffer emotional distress by the unlawful treatment by the defendants.

## FIRST CAUSE OF ACTION
## (VIOLATIONS OF TITLE VII OF THE CIVIL RIGHT ACT OF 1964
## 42 U.S.C. § 2000e AGAINST DEFENDANT MARSH & MCLENNAN COMPANIES, INC. AND MARSH, INC.—DISCRIMINATION, HARASSMENT AND RETALIATION)

138.   Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

139.   Corporate Defendants (Defendant Marsh McLennan Companies, Inc. and Marsh, Inc.)_ discriminated against Plaintiff on the basis of her national origin and gender, and sexually harassed Plaintiff in violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e by subjecting Plaintiff to (1) disparate treatment based upon her national origin and her gender; (2) subjecting her to epithets against her based on her national origin and severe and pervasive hostile actions of both sexual and national origin harassment so as to create a hostile work environment, (3) and failing to investigate her complaints of national origin and gender discrimination and sexual harassment.

140.   Corporate Defendants retaliated against plaintiff by subjecting her to threats and intimidation after management was made aware of the sexual harassment and discrimination, and harassment she was receiving.

141.   As a direct und proximate result of the Corporate Defendants' unlawful discriminatory conduct in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e Plaintiff has suffered , and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

142.     As a direct and proximate result of the Corporate Defendants' unlawful discriminatory and retaliatory conduct in violation of the Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e   Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this she is entitled to an award of monetary damages and other relief.

## SECOND CAUSE OF ACTION
## (VIOLATION OF 42 U.S.C. § 1981—EQUAL BENEFITS AGAINST DEFENDANT MARSH & MCLENNAN COMPANIES, INC. AND MARSH, INC.—DISCRIMINATION, HARASSMENT AND RETALIATION)

143.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

144.     By the actions described above, among others, the Corporate Defendants have denied Plaintiffs on the basis of her Hispanic race, Dominican national origin, ethnicity and/or color, the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by White citizens of the United States, in violation of 42 USC §1981 by subjecting her to discrimination and harassment on the basis of her protected status.

145.     Further, Corporate Defendants retaliated against plaintiff by subjecting her to threats and intimidation after management was made aware of the discrimination  and harassment she was receiving.

146.     As a direct and proximate result of Corporate Defendants' unlawful discriminatory conduct in violation of the 42 U.S.C. § 1981 Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this she is entitled to an award of monetary damages and other relief.

**THIRD CAUSE OF ACTION**
**(NATIONAL ORIGIN/RACE DISCRIMINATION UNDER THE NYSHRL—**
**DISPARATE TREATMENT AND HOSTILE WORK ENVIRONMENT AGAINST ALL**
**DEFENDANTS)**

147.   Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

148.   Defendants, including the individual defendant Evans, have discriminated against Plaintiff on the basis of her race/national origin in violation of the NYSHRL by subjecting Plaintiff to disparate treatment based upon her race/national origin, and also subjecting her to an environment permeated with racially hostile statements and epithets such that she was subject to a racially hostile work environment.

149.   As a direct und proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered , and continues to suffer, monetary and/or economic harm  for which  she is entitled  to an award  of monetary  damages  and other relief.

150.   As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this she is entitled to an award of monetary damages and other relief.

**FOURTH CAUSE OF ACTION**
**(SEXUAL HARASSMENT AND GENDER DISCRIMINATION UNDER THE**
**NYSHRL-- DISPARATE TREATMENT, HARSSMENT AND HOSTILE WORK**
**ENVIRONMENT  AGAINST ALL DEFENDANTS**

151.   Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

152.   All Defendants, including individual defendant Evans, have discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by subjecting Plaintiff to disparate

treatment based upon her gender including, and also subjecting her to sexual harassment and a hostile work environment, as well as to disparate treatment because of her gender.

153.   As a direct und proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

154.   As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this she is entitled to an award of monetary damages and other relief.

## FIFTH CAUSE OF ACTION
### (RETALIATION IN VIOLATION OF THE NYSHRL AGAINST DEFENDANT MARSH & MCLENNAN COMPANIES, INC. AND MARSH, INC.)

155.   Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

156.   By the actions described above, among others, the Corporate Defendants retaliated against Plaintiff on the basis of her protected activities in violation of the NYSHRL by issuing threats and otherwise intimidating Plaintiff, as well as reprimanding and disciplining Plaintiff after she reported the gender, race and national origin discrimination and sexual harassment she suffered.

157.   As a direct and proximate result of the Corporate Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

158.   As a direct and proximate result of the Corporate Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation,

22

embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

**SIXTH CAUSE OF ACTION**
**(RACIAL/NATIONAL ORIGIN DISCRIMINATION UNDER THE NYCHRL--**
**DISPARATE TREATMENT, HARASSMENT AND HOSTILE WORK ENVIRONMENT**
**AGAINST ALL DEFENDANTS**

159.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

160.    All Defendants, including the individual defendant Evans, have discriminated against Plaintiff on the basis of her race/national origin in violation of the New York City Human Rights Law (NYCHRL) by subjecting Plaintiff to disparate treatment based upon her race/national origin, and also subjecting her to an environment permeated with racially hostile statements and epithets such that she was subject to a racially hostile work environment.

161.    As a direct und proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered , and continues to suffer, monetary and/or economic harm  for which  she is entitled  to an award  of monetary  damages  and other relief.

162.    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this she is entitled to an award of monetary damages and other relief.

**SEVENTH CAUSE OF ACTION**
**(SEXUAL HARASSMENT AND GENDER DISCRIMINATION-- DISPARATE**
**TREATMENT, HARASSMENT AND HOSTILE WORK ENVIRONMENT  AGAINST ALL**
**DEFENDANTS**

163.    Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

164.     All Defendants, including individual defendant Evans, have discriminated against Plaintiff on the basis of her gender in violation of the New York City Human Rights Law by subjecting Plaintiff to disparate treatment based upon her gender including, and also subjecting her to sexual harassment and a hostile work environment, as well as to disparate treatment because of her gender.

165.     As a direct und proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

166.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, as well as emotional pain and suffering, for this she is entitled to an award of monetary damages and other relief.

## EIGHTH CAUSE OF ACTION
## (RETALIATION IN VIOLATION OF THE NYCHRL AGAINST ALL DEFENDANTS)

167.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

168.     By the actions described above, among others, all Defendants, including individual Defendant Evans, retaliated against Plaintiff on the basis of her protected activities in violation of the NYCHRL by issuing threats and otherwise intimidating Plaintiff, as well as reprimanding and disciplining Plaintiff after she reported the gender, race and national origin discrimination and sexual harassment she suffered.

169.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled an award of monetary damages and other relief.

170.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

## RELIEF SOUGHT

**WHEREFORE**, Plaintiff requests relief as follows:

A. An order declaring that the actions of Defendant alleged in this complaint violate 42 USC § 1981, 42 USC §2000(e), the NYSHRL, and the NYCHRL ;

B. An award of compensatory damages in an amount that would fully compensate Plaintiff, plus prejudgment interest, for the economic loss, mental anguish, emotional pain and suffering, humiliation, embarrassment, emotional distress, feelings of paranoia and distrust, depression, low self-esteem, sleep deprivation, loss of enjoyment of life and interference with life's daily activities as well as continued stress and anxiety caused by Defendants' violations of the law alleged in this complaint, in an amount to be determined at trial;

C. An award of punitive damages to Plaintiff in an amount that would punish Defendants for the willful, wanton, reckless misconduct alleged in this Complaint that would effectively deter Defendants from future discrimination and other unlawful behavior, in an amount to be determined at trial.

D. An award of all penalties available under the applicable laws;

E. An award of reasonable attorneys' fees, the fees and costs of experts, and the costs of this action; and

F. Such other relief as this Court deems just and equitable.

## JURY TRIAL

Plaintiff demands a jury trial for all causes of action and claims for which she has a right to a jury

trial on all issues of facts and damages.

Dated: New York, New York
July 28, 2017

                                        Respectfully submitted,

                                        MIRER   MAZZOCCHI   SCHALET   JULIEN   &
                                        CHICKEDANTZ, PLLC


                                        By: Ria Julien
                                        Jeanne Mirer
                                        *Attorneys for Plaintiff*
                                        150 Broadway, 12st floor
                                        New York, NY 10038
                                        (212) 231-2235
                                        rjulien@mmsjlaw.com
                                        jmirer@mmsjlaw.com